## Thomas H. Dowdall, Appellant, v. John W. Wisher, Defendant, and John T. O'Rourke, Garnishee.

*Attachment execution—Contract—Evidence.*

W., being financially embarrassed, confessed judgments to O., D. and others. Executions were issued on all these judgments on the same day, but O.'s was first placed in the hands of the sheriff. At the sheriff's sale, O. bid in W.'s horses, wagons and harness which had been used in the drayage business. After the sale, O. employed W. at a certain salary per week to carry on the drayage business. Subsequently O. sold the business and obtained more for it than the amount of his judgment against W. Two years after the sheriff's sale, D. issued an attachment execution on his judgment and summoned O. as garnishee, claiming that he had agreed to buy in the property at sheriff's sale and transfer it back to W. after he had received payment of his debt. W. testified that O. said "I want just what is due me, and as soon as I get it, I will turn the teams right over to you again." W.'s testimony was confirmed by that of his attorney. Other witnesses for the plaintiff, however, testified that the real arrangement was that O. was to be trustee for the creditors, and that, on account of said arrangement, the other creditors did not bid at the sheriff's sale. *Held*, that the evidence was insufficient to sustain an agreement on the part of O. to return the property to W.

Argued April 3, 1895. Appeal No. 245, Jan. T., 1895, by plaintiff, from judgment of C. P. No. 2, Phila. Co., Sept. T., 1887, No. 697, on verdict for garnishee. Before STERRETT, C. J., GREEN, McCOLLUM, MITCHELL and FELL, JJ. Affirmed.

Attachment execution.    Before JENKINS, J.

At the trial it appeared that on Nov. 15, 1887, John W. Wisher confessed four separate judgments as follows : John T. O'Rourke $2,300 ; Howard Hinchman $812.57 ; Thomas Dowdall $2,185.50 and Arpad & Co. $3,500.    Upon these judgments executions were issued upon the same day, that of John T. O'Rourke being first.    The defendant's horses, wagons, harness and drays, which he used in the drayage business, were levied upon, and at the sheriff's sale bought in by O'Rourke. After the sale O'Rourke employed Wisher at a salary of $25.00 per week to carry on the drayage business.    Subsequently a large hauling contract was obtained, for the faithful performance of which O'Rourke entered heavy security.    About a year after the sheriff's sale, the business was sold for an amount considerably in excess of O'Rourke's claim against Wisher. About two years after the sheriff's sale Dowdall issued an attachment execution and summoned O'Rourke as garnishee, claiming that O'Rourke prior to the sheriff's sale had promised Wisher to transfer back to him the property to be sold at the sale, after his debt had been paid.    On this subject Wisher testified as follows :

" I left my house possibly at five o'clock, and went to the stable and hitched up a dog cart, and drove up to his, O'Rourke's, house.·  He was then living on Second street, I think it was above York he lived.    I got up to his house before six o'clock ; nobody was up yet ; I woke him up, and he asked me what I was doing up there.    I told him that I was about to be sheriffed, and I wanted to make him a preferred creditor for the benefit of my other creditors in Philadelphia.    I intended to do the right thing, I told him, and I had also told him that I intended to give one to Mr. Hinchman and one to Thomas H. Dowdall, but I wanted him to be first, therefore I went for him first so early in the morning.    I brought him down in my dog cart to the corner of Water and Race streets, where I had my office at the time, and there was a restaurant then on the corner ; we went in there and got our breakfast, and talked the matter over there, what we intended to do."

" Q. What did you talk—what was it ?   A. I told him that I intended turning over the whisky I had to B. F. Simms & Co. and the book accounts, and let them go out and collect them.

Harpazdt, Harasthian & Co. I would turn over the wines and the book accounts connected with them and let them have it, but my teams, I did not want them to seize them, because if they did it would swamp out the Philadelphia creditors. He said to me, 'Mr. Wisher, you have done the right thing by me and I intend to do the right thing by you; all I want, Johnnie, is my money, what is entitled for me to get, and then the balance of it you can do as you please with it.' He said, 'That is all I want; I want just what is due me, and as soon as I get it I will turn the teams right over to you again.' He says, 'You have done the right thing,' patting me on the back, and even plaiting my tie for me, and I thought him a good friend of mine, and that is why I went there to him; I thought he would take care of me because I took care of him. That was the understanding—I went there to take care of him. After breakfast we came right down to my attorney's office, he was then on Fifth street above Locust, Mr. Keator's office. Q. What happened there? A. I confessed a judgment to him. Mr. Keator was there early, possibly eight o'clock; I had made arrangements with him to have him there early, too; I had made arrangements with my attorney, too, . . . . O'Rourke says I am going to do the right thing by Mr. Wisher; I have got this thing in my hands and I am first, and I assure you, gentlemen, I don't want anything but what just belongs to me."

Mr. Keator, counsel for the defendant Wisher, testified as follows:

" Mr. O'Rourke said that he had no desire for anything except the money that Mr. Wisher actually owed him, that he was his friend, and that when he was paid off the money that was actually owed him that he would be ready to transfer the teams, if he should be fortunate enough to buy them at the sheriff's sale in the regular way, to either Mr. Wisher or whomsoever he might indicate, because he felt sorry for him that he got into trouble, and it was all talked over about this pressure coming upon Wisher at the time by Mr. Simms, who was one of the liquor business creditors from Kentucky, I think, and precipitated this trouble."

The plaintiff Dowdall, testified as follows: " At a Mr. Smith's office it was agreed that Mr. O'Rouke was to buy the teams, and after Mr. Wisher had raised enough money to pay us what

he owed us the teams were to be turned back again to Wisher. I recollect the meeting, and I remember that Mr. Hinchman was not altogether satisfied at the meeting with O'Rourke being the trustee for the creditors, and afterwards O'Rouke bought Hinchman's claim, and I was agreeable to O'Rourke being the trustee, and that was the reason there was no other meeting; it was agreed after that."

Mr. Fels, then counsel for plaintiff, testified to a meeting of certain of the execution creditors at the office of Mr. Smith after the issuing of executions, and to the fact, as he understood it, that there was to be another meeting of these execution creditors for the purpose of selecting some one to buy the property in for them.

It was also stated by Dowdall that in consequence of the arrangement made at Mr. Smith's office the other creditors did not bid at the sheriff's sale.

The court charged as follows:

" I hardly think that you can appreciate, from the testimony that has been produced in this case, what it was you were called upon to try.   The allegation upon the part of the plaintiff was that the defendant in this issue, who is what is called a garnishee in an attachment sur judgment, had in his hands money or things of value that were due or belonging to the defendant, Wisher.   [The evidence utterly fails to sustain the plaintiff's contention, and your verdict, therefore, must be for the garnishee.] " [27]

Verdict and judgment for garnishee.   Plaintiff appealed.

*Error assigned*, among others, was (27) above instruction, quoting it.

*John S. Freeman, John F. Keator* and *Owen B. Jenkins* with him, for appellant, cited: Leibig v. Steiner, 94 Pa. 466; Fessler v. Ellis, 40 Pa. 248; Kellam v. Kellam, 94 Pa. 225; Maffet v. Ijams, 103 Pa. 266.

*W. Horace Hepburn*, for appellee, cited: Dollar Savings Bank v. Bennett, 76 Pa. 402; Bennett v. Bank, 87 Pa. 382; Phillips v. Hull, 101 Pa. 567; Eckles v. Slingluff, 24 Pa. 450; Barton v. Benson, 126 Pa. 431.

PER CURIAM, April 22, 1895 :

We find no substantial error in either of the rulings of the learned trial judge. He was clearly right in holding that the evidence was insufficient to sustain plaintiff's contention, and in directing a verdict in favor of the defendant garnishee. There is nothing in either of the specifications that requires discussion. Neither of them is sustained.

Judgment affirmed.